# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

PHILLIP BURGESS, # 508657,      )
                                    )
        Petitioner,            )
                                    )
v.                                )     No. 1:22-cv-00014
                                    )
JASON CLENDENION,         )     JUDGE CAMPBELL
                                    )     MAGISTRATE JUDGE HOLMES
        Respondent.         )

## MEMORANDUM OPINION AND ORDER

Petitioner Phillip Burgess, who is currently in the custody of the Turney Center Industrial Complex in Only, Tennessee, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his convictions for first-degree murder and attempted first-degree murder. (Doc. No. 1). For the reasons below, the petition will be denied.

## I.     PROCEDURAL HISTORY

### A.  Trial and Direct Appeal

Petitioner was convicted in 2012 for first-degree murder of Joey Perryman, attempted first-degree murder of Jordan Beavers, and aggravated assault against Hunter Keel. (Doc. No. 10-19 at 6); *State v. Burgess*, No. M2013-00252-CCA-R3CD, 2014 WL 309644 (Tenn. Crim. App. Jan. 28, 2014). He was sentenced to life imprisonment for first-degree murder, plus 15 years for attempted first-degree murder and three concurrent years for aggravated assault. (Doc. No. 1 at 1; Doc. No. 10-19 at 2.)

On direct appeal, Petitioner argued that the State failed to disclose evidence to trial counsel, thereby denying Petitioner a fair trial, and that the trial court erred in denying Petitioner's motion for new trial based on alleged evidentiary errors, violations of *Brady v. Maryland*, 373 U.S. 83

1

(1963), and new evidence. (Doc. No. 10-12 at 6−8, 15−33). The Tennessee Court of Criminal Appeals affirmed the judgments of conviction. (Doc. No. 10-19 at 23). Petitioner did not timely apply for permission to appeal to the Tennessee Supreme Court.

### B. State Postconviction Proceedings

In October 2014, Petitioner filed a pro se petition for state postconviction relief. In it, he raised the following grounds for relief:

- trial counsel was ineffective for

    - failing to move to dismiss the prosecution as sanction for the State's failure to preserve a broken beer bottle found in the garbage at the scene of the shootings;

    - coercing Petitioner not to testify;

    - failing to pursue a defense theory of diminished capacity;

    - failing to subpoena Petitioner's telephone records;

    - failing to investigate and call various witnesses, including Shawn Julian and an expert to testify about the effects of Xanax; and

    - failing to withdraw due to a conflict of interest; and

- appellate counsel[1] was ineffective for failing to raise these issues in the motion for new trial and on appeal, as well as for failing to subpoena Ms. Belew to testify at sentencing.

(Doc. No. 11-1 at 3−46).

At a postconviction hearing, Petitioner's counsel orally moved to amend the postconviction petition to state a claim based on appellate counsel's failure to file an application for permission to appeal to the Tennessee Supreme Court. (Doc. No. 11-3 at 13).

The postconviction court granted partial relief and allowed Petitioner to file an untimely application for permission to appeal to the Tennessee Supreme Court on direct appeal. (Doc. No. 11-2 at 26). The Tennessee Supreme Court granted Petitioner permission to file the

---

[1] Petitioner's appellate counsel also represented him at sentencing and litigated a motion for new trial. For consistency with the state-court opinions, this Court refers to the attorney as "appellate counsel."

application out of time but denied the application itself. (Doc. No. 10-24). Following Petitioner's unsuccessful application to the Tennessee Supreme Court, the postconviction court denied relief on Petitioner's remaining claims. (Doc. No. 11-2 at 72−94).

On appeal, Petitioner argued the same grounds as those raised in his postconviction petition. (Doc. No. 11-13). The Tennessee Court of Criminal Appeals affirmed. (Doc. No. 11-15); *Burgess v. State*, No. M2020-00028-CCA-R3-PC, 2021 WL 928475 (Tenn. Crim. App. Mar. 11, 2021). Petitioner did not file an application for permission to appeal in the Tennessee Supreme Court.

### C. Federal Section 2254 Proceedings

Petitioner next filed a 28 U.S.C. § 2254 petition for a writ of habeas corpus in this Court. The Petition raises the following grounds for relief:

1. trial counsel was ineffective for

   a. failing to move to dismiss the prosecution as sanction for the State's failure to preserve the broken beer bottle found in the garbage at the scene of the shootings;

   b. coercing Petitioner not to testify;

   c. failing to pursue a defense theory of diminished capacity;

   d. failing to subpoena Petitioner's telephone records;

   e. failing to investigate and call Shawn Julian and an expert to testify about the effects of Xanax as witnesses at trial; and

   f. failing to withdraw due to a conflict of interest; and

2. appellate counsel was ineffective for

   a. failing to subpoena Ms. Belew to testify at sentencing; and

   b. failing to prepare and file an adequate record on appeal.

(Doc. No. 1 at 5−22).

3

## II.    SUMMARY OF THE EVIDENCE

### A.  Trial Evidence

The Tennessee Court of Criminal Appeals on postconviction review summarized the trial

evidence as follows:

> [I]n early August 2011, the Petitioner allowed a friend of a friend, Jeanette Belew, to stay at his apartment with her infant daughter for about six days after she moved to Lewisburg. Ms. Belew testified that she became uncomfortable with the arrangement after the Petitioner asked her to pretend to be his girlfriend, then later asked her to become his girlfriend. Ms. Belew decided to stay at another male friend's vacant apartment and moved her belongings there on August 6, 2011. Ms. Belew stated at trial that the Petitioner helped her pack. While at her new apartment complex, Ms. Belew encountered Mr. Perryman, as well as Traci Beavers, who was Mr. Perryman's sister, Mr. Beavers, and Mr. Keel, who were both Mr. Perryman's nephews. Ms. Belew was previously acquainted with Mr. Perryman, and the group made plans to eat together at Ms. Belew's new apartment the following day.
>
> Ms. Belew testified that throughout the morning of August 7, 2011, the Petitioner sent her text messages accusing her of stealing his Xanax; he also told her that he would bring her mail to the new apartment. In the afternoon, Ms. Belew was in the shower when she heard a knock at the door. She exited the bathroom and found the Petitioner standing in the living room holding a cell phone, pieces of mail, and a beer. Ms. Belew averred that his presence surprised her because she had not informed him of her new address.
>
> Ms. Belew testified that she "cursed" the Petitioner and told him to leave; however, he instead sat down at the kitchen table. At this point, Mr. Perryman and Mr. Beavers arrived; when Mr. Perryman asked what was happening, Ms. Belew told him that she could not "get this MF'er out." According to Ms. Belew, Mr. Perryman began cursing and told the Petitioner that he needed "to get the hell out." The Petitioner left the apartment calmly without saying anything.
>
> Ms. Belew testified that after the Petitioner left, she asked Mr. Perryman and Mr. Beavers to remain in the apartment while she finished her shower. While she was in the shower, she heard another knock at the door and heard the Petitioner say, "F--- you, mother f-----s" followed by sounds she later realized were gunshots. Mr. Beavers came into the bathroom bleeding from a gunshot wound to his chest, told Ms. Belew that Mr. Perryman had been shot, and tried to hide in the closet. Ms. Belew heard Mr. Perryman calling for help, but she was unable to open the bathroom door. Mr. Beavers then used an electric guitar he found in the closet to smash a hole in the bathroom door, and Ms. Belew called 911 and attended to Mr. Perryman. Mr. Perryman eventually succumbed to his injury, which at autopsy reflected a fatal gunshot wound to the torso.

4

On cross-examination, Ms. Belew acknowledged that she initially told police that the Petitioner had driven her to the new apartment and helped her move in her belongings. She said that she changed her statement the following day and acknowledged that she blamed her initial mistake on the fact that she had consumed too much beer on the day of the incident.

Jordan Beavers, who was sixteen years old at the time of the June 2012 trial, testified that he, Mr. Keel, and Mr. Perryman arrived at Ms. Belew's apartment to find Ms. Belew wrapped in a towel and seated at the table talking to a heavyset man wearing a voluminous Hawaiian-print shirt, whom Mr. Beavers later identified as the Petitioner. Mr. Beavers recalled that Mr. Perryman asked the Petitioner why he was in the apartment, and the Petitioner replied that he was delivering Ms. Belew's mail. Mr. Perryman cursed the Petitioner and told him to leave. According to Mr. Beavers, the Petitioner "just said, 'Okay,'" and left. No physical altercation occurred between the men.

Mr. Beavers testified that while Ms. Belew was taking a shower, the three men heard a knock, and Mr. Perryman answered the door. Mr. Beavers said that Mr. Perryman saw the Petitioner standing at the door, cursed at him, and asked why he had returned. The Petitioner replied that he had forgotten something, and he raised a gun and fired it at Mr. Perryman, who fell into the kitchen counter. After the Petitioner shot Mr. Perryman, he came into the apartment, pointed the gun at Mr. Beavers, and fired. Not realizing he had been shot, Mr. Beavers ran into the bathroom, where he hid in a closet. While he was in the bathroom, he heard Mr. Perryman plead for his life. Mr. Beavers testified consistently with Ms. Belew regarding his using a guitar to break through the bathroom door.

Mr. Beavers said that upon emerging from the bathroom, he left the apartment without checking on Mr. Perryman and saw Ms. Beavers and his girlfriend, Isabella Jacobson, waiting in Ms. Beavers's car. Ms. Beavers drove toward the hospital, flagging down a police car on the way and alerting them to the situation at Ms. Belew's apartment. Mr. Beavers suffered a "through-and-through" gunshot wound to the chest.

On cross-examination, Mr. Beavers admitted that Mr. Perryman had told the Petitioner, "Get the f--- out. Before I beat your a--." Mr. Beavers denied that Ms. Belew was arguing with the Petitioner when he initially arrived at the apartment. He affirmed that Ms. Belew asked Mr. Beavers not to call the police after the shooting.

Hunter Keel, who was fourteen years old at the time of the June 2012 trial, testified consistently with Mr. Beavers regarding the circumstances in which they initially encountered the Petitioner, including Mr. Perryman's cursing the Petitioner and telling him to leave. Mr. Keel affirmed that the Petitioner left without comment. Mr. Keel noted that Mr. Perryman was not generally "nice" to anyone.

Mr. Keel also testified that when Mr. Perryman opened the door a short time later, the Petitioner claimed to have forgotten something, pulled out a gun, and shot Mr. Perryman. Mr. Keel "shut the door and got on the ground." After he saw Mr. Beavers run into the bathroom, Mr. Keel ran out the front door. Mr. Keel heard an additional gunshot and believed the Petitioner was shooting at him. Mr. Keel eventually ran to Ms. Beavers's apartment and waited for the police to arrive before returning to Ms. Belew's apartment. Mr. Keel admitted that he "might have been dramatic" in his initial police statement, in which he relayed that he attacked the Petitioner with an object and that the Petitioner chased him out of the apartment and shot at him; he acknowledged that his trial testimony was "somewhat different" from the statement.

Nolan Pippen, a resident of the apartment complex, said that at approximately 1:00 p.m. on August 7, 2011, he saw "a very large man, very large proportioned man, who was unusual looking" and wearing a large "flowery" shirt go into Ms. Belew's apartment. Mr. Pippen saw the man leave, and sometime later, he heard gunshots and saw a Caucasian teenager run out of Ms. Belew's apartment "like he was running a 100-yard dash."

Sixteen-year-old Isabella Jacobson testified that she was outside Ms. Beavers's apartment when she saw the Petitioner walk to Ms. Belew's apartment door and knock; when someone opened the door, Ms. Jacobson saw the Petitioner's hand raise, and she heard gunshots. The Petitioner entered the apartment, and Mr. Keel ran outside. Ms. Jacobson alerted Ms. Beavers, and they drove in Ms. Beavers's car toward the apartment complex parking lot. As Ms. Beavers drove Ms. Jacobson toward the parking lot, they saw the Petitioner, and Ms. Beavers asked him, "Did you just shoot my son and my brother?" The Petitioner responded, "No, I don't know what you are talking about." Upon arriving at Ms. Belew's apartment, Ms. Jacobson walked inside and saw broken glass and spilled beer on the floor. Mr. Perryman was on the floor holding his side; he asked her for help because he had been shot. Ms. Jacobson also saw Ms. Belew and Mr. Beavers inside the bathroom; upon realizing that Mr. Beavers had been shot, Ms. Jacobson and Ms. Beavers took him to the hospital.

Lewisburg Police Sergeant Jerry Broyles testified that at the crime scene, Ms. Belew was standing in the doorway wrapped in a towel. She told him that the Petitioner had shot Mr. Perryman and Mr. Beavers and that the Petitioner had left the area. Sergeant Broyles later responded to a location in which the Petitioner was sitting in his car; after the Petitioner was arrested, another officer pointed out to Sergeant Broyles a Hawaiian-print shirt and a pistol inside the vehicle.

Lewisburg Police Detective James Johnson testified that he interviewed the Petitioner after the Petitioner had waived his rights; the Petitioner gave a written statement and a corresponding one-hour recorded statement. In the written statement, the Petitioner recounted that a friend brought "some girl" to his apartment who needed a place to stay. He said that the woman stayed with him from Sunday to Friday and then left with "no goodbye or anything." The Petitioner wrote

6

that when the woman would not answer his calls, he asked a friend where she had gone. The Petitioner went to that location, and a maintenance man told him where she was staying. He knocked on the door, and the woman told him to come inside and that she was in the shower. When he went inside, the two of them sat at a table discussing "forgiveness." The Petitioner described what happened next:

> Then some bad [M]exicans came and saw me the[y] said I was a FN cop and the[y] was going to kick my ass and kill me because I'm and [sic] pig he came at me with a beer bottle and called me more names then the others came at me the girl disappeared I put out my [hip] 380 cocked it and it did not matter they was going to kill me I shot at the ... wall and the bathroom wall door area not aiming at anyone then I left and some chick called the cops.

After the conclusion of the State's proof, the trial court conducted a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161−62 (Tenn. 1999), after which the Petitioner elected not to testify, saying, "The statement made with the audio tape was good enough[.]" The defense did not present any further proof. The jury convicted the Petitioner of the first degree murder of Mr. Perryman, the attempted first degree murder of Mr. Beavers, and the aggravated assault of Mr. Keel. However, the jury acquitted the Petitioner of the aggravated assault of Ms. Belew.

(Doc. No. 11-15 at 2−6) (footnotes and citations omitted).

The Tennessee Court of Criminal Appeals summarized the evidence introduced during

postconviction proceedings as follows:

### *a. First evidentiary hearing*

The Petitioner testified that the Public Defender's Office represented him in General Sessions Court, at his preliminary hearing, and throughout his trial in Circuit Court. The Petitioner stated that the first time he met trial counsel, he told counsel that he "shot the beer bottle next to the bathroom door and the wall." When the Petitioner received a copy of the discovery materials, he realized that the beer bottle fragments were not collected as evidence. The Petitioner averred that he told counsel the bottle was important because Mr. Perryman used the bottle to attack him. The Petitioner did not recall, though, whether he asked counsel to file a motion related to the fragments.

The Petitioner agreed that the crime scene photographs of the fragments were taken after Ms. Belew swept up and discarded them; he further agreed that beer visible on the floor in the photographs was consistent with the location in which the bottle fell. The Petitioner stated that Mr. Perryman "slung" the bottle at him, that the pistol touched the bottle, and that the Petitioner shot the bottle. The Petitioner asserted that the bottle fragments and beer from the bottle would have contained gunshot residue because according to the police, no gunshot residue was found elsewhere

7

at the crime scene or on Mr. Perryman's body. The Petitioner stated that the fragments "could have been tested" and that the police knew the bottle was "part of [the Petitioner's] statement."

The Petitioner acknowledged that trial counsel could not have done anything to retrieve the bottle fragments or reassemble them, that the fragments were thrown away before he met counsel, and that he never asked counsel to file a motion to dismiss based upon the missing fragments. The Petitioner averred that the fragments would have proven his theory of self-defense because they would reflect that he "shot the beer bottle that was swung at [him]." The Petitioner thought that Ms. Belew testified at trial that the beer bottle fell on the floor.

The Petitioner testified that at trial, trial counsel talked to him for about thirty minutes about whether he would testify. According to the Petitioner, counsel told him that because he "had nothing entered on [his] behalf," the Petitioner "was probably going to get yelled at and stuff by [the prosecutor]" and that the Petitioner's written and audio-recorded statements were sufficient to prove self-defense. The Petitioner said that counsel recommended against his testifying because he "didn't have [any]thing else up there backing [him]." The Petitioner decided not to testify based upon counsel's recommendation. When asked whether he felt counsel "forced" him not to testify, the Petitioner stated, "I understood what they were saying when I didn't have [any]thing to back ... up ... what I would say on the stand." He agreed that the evidence was "[his] word versus the word of everybody else that was there." When asked whether his credibility might have been enhanced by giving consistent accounts of events in comparison to witnesses' varying stories, the Petitioner responded negatively.

The Petitioner testified that trial counsel visited him in jail before the trial and told him that he could testify if he wanted to do such, although it would be the Petitioner's word against that of the witnesses. The Petitioner denied that counsel ever prepared him to testify. When asked how counsel "coerced" him into not testifying, the Petitioner said, "I took their advice ... and I don't know the process that well[.]" The Petitioner noted that he did everything counsel told him to do.

The Petitioner testified that he wanted several witnesses called to testify at trial on his behalf. He said that "T[-]Roy," whose legal name he did not know, would have testified about why the Petitioner was parked "on the hill" and why he was carrying a gun. According to the Petitioner, T-Roy told the Petitioner that the Petitioner's transmission was going bad and that the Petitioner should "do all [his] running all at one time." The Petitioner noted that he had the pistol on the day of the shooting because he was taking it to his father's house for safekeeping after multiple burglaries occurred at the Petitioner's apartment complex.

The post-conviction court interjected and asked what difference the location of the car would have made to the Petitioner's self-defense argument. The Petitioner replied, "I guess it wouldn't matter, would it?"

The Petitioner testified that he saw Dr. Jon Garrison for two one-hour appointments before his trial. The Petitioner stated that at one jail visit, trial counsel conveyed Dr. Garrison's report that the Petitioner was "a little bit off"; counsel did not discuss Dr. Garrison's findings again or tell the Petitioner how they might help or hurt his defense. On December 24, 2014, the Petitioner saw for the first time a letter Dr. Garrison wrote to the parties and the trial court discussing diminished capacity. The Petitioner agreed that diminished capacity could "help your mental state down a level or two." The Petitioner stated that at his sentencing hearing, Dr. Garrison testified "that if you back somebody into a corner that they're going to defend themselves like [the Petitioner] had to." The Petitioner opined that had Dr. Garrison testified at trial, it might have made a difference to his case.

The Petitioner testified that he had been going to "Centerstone" for mental health treatment for more than one year before the shooting. He said that he saw "an elderly lady" and a man who prescribed him Bupropion and Xanax for anxiety. The Petitioner suffered from anxiety attacks in which he felt closed in, "like [he was] going to freak out," and as though he would have a heart attack. The Petitioner stated that he had clinical depression and anxiety and that he did not know whether Dr. Garrison reviewed his Centerstone records. The Petitioner averred that he told trial counsel about his taking Xanax on the day of the incident and asked counsel whether it would help the defense if the Petitioner had "too much in [him]"; however, counsel were not "interested in that." The Petitioner stated that his mental health had improved somewhat since the shooting.

The Petitioner affirmed that he suffered a "closed head injury" in a 1999 automobile accident during which the Petitioner's head went "halfway" through his windshield after a car pulled in front of him and hit his vehicle. When asked whether the injury affected his ability to think, the Petitioner replied, "I don't know, it may have. I'd say, yes." Although the Petitioner thought that he "probably" told trial counsel about the accident and that the other driver died, he did not believe he told counsel about his mental health history and previous head trauma.

The Petitioner testified that he wanted trial counsel to question Ms. Belew at trial about their lack of a romantic relationship; he noted, though, that he did not know if this information was "actually relevant to self-defense." The Petitioner stated that he also wanted Ms. Belew questioned about the Petitioner's telephone call to her before the incident, noting that he did not have the ability to send text messages. The Petitioner opined that Ms. Belew lied about receiving text messages from him. He added that Ms. Belew knew he was coming to her apartment to drop off mail.

The Petitioner testified that Shawn Julian was the mutual friend who arranged for Ms. Belew to stay with the Petitioner. The Petitioner wanted Mr. Julian called as a witness because he could impeach Ms. Belew's testimony that she had not met the Petitioner previously; the Petitioner asserted that he met Ms. Belew at Mr. Julian's home one year prior to the incident. The Petitioner stated that he asked trial counsel to subpoena Mr. Julian as a witness, but that counsel did not do such.

The Petitioner testified that at the time he received the discovery materials, he was dissatisfied with trial counsel and did not believe they were "really doing anything to help" him. He elaborated that every time he told counsel his version of events, "they would be combative ... about it" and that "[it] just seem[ed] like they didn't believe" the Petitioner. The Petitioner noted that counsel told him "well, they're going to say this and that if you go to trial." The Petitioner opined that counsel were not representing his interests. He said, though, that counsel visited him in jail when they had questions for him or wanted to tell him something.

The Petitioner testified that in early March 2012, three months before trial, trial counsel filed a motion to withdraw because the Public Defender's Office had also represented Mr. Beavers in an unrelated criminal case. According to the Petitioner, the prosecutor said at a hearing on the motion that the State "didn't mind" counsel's continuing to represent the Petitioner, and the trial court "agreed" with the State. The Petitioner was not asked to sign a waiver of the conflict of interest. The Petitioner stated that at some point after the hearing, he asked counsel to "go back up and tell them to give [him] another lawyer" but that the District Public Defender refused. The Petitioner said that he wished he would have asked the trial court for another lawyer. Post-conviction counsel noted that during the motion to withdraw hearing, another defendant was "sitting back there and he asked for a different attorney and he got one."

The Petitioner estimated that in an effort to obtain other counsel, he contacted between seventeen and twenty attorneys after asking jail staff for their contact information. However, he could not find another attorney to take his case, and he noted that it was difficult to retain an attorney while in jail with no money.

The Petitioner testified that the Public Defender's Office represented him through the end of his trial, that the Petitioner's family then hired appellate counsel, and that at an August 8, 2012 hearing, the District Public Defender "and them quit [the Petitioner]." As a result, appellate counsel represented the Petitioner during his sentencing hearing and at the motion for new trial proceedings.

The Petitioner testified that appellate counsel did not subpoena Ms. Belew to the sentencing hearing; according to the Petitioner, at some point, Ms. Belew informed appellate counsel that the Petitioner told her about seeing shadow demons. The Petitioner denied, though, that he saw shadow demons at the time of the shooting.

Relative to the Petitioner's statement to police that "bad Mexicans" attacked him, the Petitioner testified that as he approached Ms. Belew's apartment he saw three people in the parking lot who "looked like Mexicans[.]" The Petitioner noted that the discovery materials reflected Mr. Perryman's having had cirrhosis, which had altered his skin tone. The Petitioner further described Mr. Perryman as having "a fu manchu, like thing going on, and he was tatted down both sides, and tattoos down both sides of him, and he looked like he was Hispanic." The Petitioner asserted that appellate counsel should have introduced a photograph of Mr. Perryman to show why the Petitioner thought he was Mexican and in order to "have a better

10

understanding of what [the Petitioner] was up against that day." The Petitioner expressed his belief that Ms. Belew stole his prescription medication, that she knew he had "extras that she didn't get," that she told him to come to the apartment in order to set him up for a robbery, and that Ms. Belew arranged for the men to come inside, attack the Petitioner, and take his medication and money.

The Petitioner testified that appellate counsel never discussed with him filing an appeal to the Tennessee Supreme Court after his direct appeal was denied. The Petitioner noted that he "had to" communicate with counsel through the Petitioner's family members and that he had no personal conversations with counsel after they met in court. The Petitioner affirmed that he did not sign a written waiver relative to a Rule 11 appeal and that no Rule 11 appeal was filed. The Petitioner also noted that counsel never informed him that counsel was withdrawing or that counsel was not responsible for filing a Rule 11 appeal.

The Petitioner testified that he filed a complaint with the Board of Professional Responsibility regarding appellate counsel's failure to respond to a letter in which the Petitioner requested a copy of his file. Thereafter, counsel sent the Petitioner a letter and provided the file to the Petitioner's family.

On cross-examination, the Petitioner acknowledged that his testimony differed from his police interview, and he noted that he "added to it." The Petitioner stated that Mr. Keel was Caucasian, and Mr. Beavers had "light brown" skin or was biracial. The Petitioner did not know whether Ms. Belew discarded the bottle fragments before the police arrived. The Petitioner reviewed his written statement and agreed that it established how he knew Ms. Belew. The Petitioner said that when he arrived at Ms. Belew's apartment, he had a sixteen-ounce can of beer. He agreed that Ms. Belew testified at trial to "fussing at" him and telling him to leave, as well as refusing to become his girlfriend.

The Petitioner acknowledged Mr. Pippen's testimony that he saw the Petitioner walking away from Ms. Belew's apartment and later heard gunshots, as well as Isabelle Jacobson's testimony that she saw the Petitioner knock on Ms. Belew's door and heard gunshots immediately afterward. The Petitioner denied that these respective events occurred.

The Petitioner read his written statement aloud, and he added that after Ms. Belew "disappeared," the Petitioner pulled out his gun; he added that the three men surrounded him. When asked whether he told police that he had time to pull out the gun and chamber a round, the Petitioner said,

> When I was sitting there, and they came in, Perryman, the first thing he said to me was, cop, pig. He called me like [fourteen] different names. Then, Belew was sitting at the other side of the table. He goes over by [Ms.] Belew, and he's like right behind her. He has a Colt 45 beer bottle in one hand and a cigarette in the other, and he looks right at me and says, I'm going to beat you to death and throw

11

your body into the Duck River, and you'll be lucky if you're ever found.

....

Okay. He said that to me, and then he leans over and puts his cigarette out and says, leave, [b--ch]. I thought he was talking to me. I said I don't want no problems.... And [he] like moves back. She disappears. She went into the bathroom is what she did[.]

The Petitioner stated that he believed the men were going to kill him and that he "shot at the bottle" after the bottle made contact with the barrel of the pistol. Upon questioning by the post-conviction court, the Petitioner opined that the bottle broke when he shot it, but he acknowledged that the bottle "might have shattered even if [he] didn't shoot it" when the bottle touched the pistol.

The Petitioner agreed that he gave his written statement on the day of the incident, including his claims that he acted in self-defense and that he did not leave the apartment and return. When asked whether it made sense for a defense lawyer to argue alternative theories of self-defense and diminished capacity, the Petitioner replied that it "would be a smart thing." The prosecutor then attempted to explain why diminished capacity was incompatible with a theory of self-defense, but the Petitioner did not understand this line of questioning.

Relative to the Petitioner's asking appellate counsel about filing a Rule 11 appeal, the Petitioner testified that his parents communicated to him counsel's response that the Petitioner could file one if he desired, but that "only five get accepted a year, so it might not make a difference to do it." The Petitioner said that appellate counsel did "everything" that the Public Defender's Office "should have" done, although the Petitioner was unhappy that appellate counsel did not subpoena Ms. Belew to the sentencing hearing. The Petitioner said that if Ms. Belew had testified regarding the Petitioner's mental illness at the sentencing hearing, it "might have made a difference, [or] it might not have."

The Petitioner reiterated that he wanted the Tennessee Bureau of Investigation and police detectives to reconstruct the broken beer bottle and test it for gunshot residue because the beer might not have washed any such residue off the glass fragments. The prosecutor asked the Petitioner if he knew whether a method existed by which such testing was possible, but the Petitioner did not understand the question.

The Petitioner testified that during trial, he told trial counsel that he wanted to testify to "clear up some stuff." The Petitioner acknowledged the trial court's *Momon* colloquy and his answers under oath. The Petitioner noted that he "tried to talk to" the trial court about the issue but could not; he admitted, though, that the occasion to which he referred did not occur at the time of the colloquy.

The Petitioner testified that he wanted trial counsel to ask Ms. Belew additional questions during her testimony. When asked whether he understood why counsel

might have declined to question Ms. Below if counsel knew her answers would contradict the Petitioner's police statements, the Petitioner replied that at the time he gave his police statements, he was "freaked out." He acknowledged, though, that he told the police "what happened," including his shooting the beer bottle.

Relative to Mr. Julian, the Petitioner averred that Ms. Below told the Petitioner that she was a lesbian and that Mr. Julian's testimony on this point would have undermined the State's theory that the shooting arose from a "love-triangle." The Petitioner stated that during the sentencing hearing, Dr. Garrison "said [the Petitioner] had a ground to argue" diminished capacity. The Petitioner agreed, though, that Dr. Garrison made no statement about whether he would have testified at trial in support of the Petitioner's diminished capacity.

The sentencing hearing transcript, which was received as an exhibit, reflected that at the hearing, Dr. Garrison acknowledged his November 7, 2011 letter assessing the Petitioner's competency to stand trial, including a statement that the Petitioner "[did] appear to have a basis for a claim of diminished capacity." Dr. Garrison agreed that the letter reflected the "standard" matters he addressed in response to an order for a psychological evaluation. When asked to elaborate on his statement regarding diminished capacity, Dr. Garrison responded, "I am saying it is potentially an issue. I am not concluding he has diminished capacity. I am saying he has an issue that needs to be argued." Dr. Garrison agreed that the prosecutor visited him before trial to discuss the Petitioner's case. He stated that if he were able to modify the statement about diminished capacity, he would have written that the Petitioner had a "basis for arguing diminished capacity, not concluding diminished capacity, but at least arguing it." Dr. Garrison explained that he based his opinion upon the Petitioner's having two "Axis I" diagnoses; according to Dr. Garrison, another practitioner at Centerstone diagnosed the Petitioner in December 2010 with "agoraphobia, with panic disorder, and also major depression or depressive disorder, recurrent severe, with no mention of psychosis." Dr. Garrison noted that the Petitioner's diagnoses predated the shooting incident. Dr. Garrison opined that his assessment of the Petitioner's potential diminished capacity was "conservative" and based upon Dr. Garrison's finding enough "evidence" to "allow the defense attorney to make the argument if they choose to."

On cross-examination, Dr. Garrison testified that he also concluded that the Petitioner had a "personality disorder" that probably resulted from "his upbringing" and subsequent experiences; he noted that the Petitioner reflected "a lack of social interactions and a lack of social skills[.]" Dr. Garrison declined to render an opinion of the Petitioner's "mental development," and he commented that he knew of no test to determine a patient's mental "age."

Appellate counsel testified at the post-conviction hearing that he began practicing law in Spring 2011, that he ran for District Public Defender in 2014, and that he represented the Petitioner for his sentencing hearing, motion for a new trial hearing, and direct appeal. Counsel noted that he was "not really allowed to raise ineffective assistance on direct appeal, [and] that's mostly what this case [was] about." Counsel

13

stated that upon reviewing the trial record, "the most glaring thing" he noticed was "a golden Easter egg that came out of Centerstone," Dr. Garrison's evaluation. According to counsel, Dr. Garrison thought the Petitioner's "mental condition was so bad that Dr. Garrison actually included in his report that" the Petitioner had diminished capacity. Counsel noted that in his experience, such a statement was rare in a competency determination, and he posited that Dr. Garrison "sort of sua sponte ... threw that in." Appellate counsel opined that trial counsel's failure to "explore that avenue ... was really glaring."

Appellate counsel testified that Dr. Garrison offered "very favorable" testimony at either the sentencing or motion for a new trial hearing, although he could not remember at which hearing Dr. Garrison testified. Counsel noted that he was "very impressed" with Dr. Garrison and opined that Dr. Garrison would have been a "great witness for the jury." Counsel stated that he had a "huge amount" of the Petitioner's medical records from Centerstone; however, he did not recall whether he entered them into evidence at the sentencing hearing. Appellate counsel stated that although the records were relevant to proving diminished capacity, in light of the fact that trial counsel's defense strategy did not involve diminished capacity, the records would not have been useful. When asked whether self-defense and diminished capacity could be presented together as a joint defense, appellate counsel replied,

> Absolutely. As a matter of fact, that is common even because the whole question really is because we're dealing with self-defense ... we want to know this particular person, this particular situation. We deal commonly with post-traumatic stress clients. We want to know that particular person that particular situation, that particular time did they have some basis. So, when we talk to the jury, it's very common that we weave those two together, yes.
>
> ....
>
> In this particular case, to be clear about this, I think it would have been a mistake to do either without the other.... [The Petitioner was] very consistent the entire time. The facts made out a case for self-defense. And then, after you do the basic due diligence that any trial counsel or criminal defense counsel did with respect to [the Petitioner's] background, then his mental health problems ... just jumped out -- so, I really think that if you had pursued either strategy in isolation of that, the effectiveness would have been much more limited.

Appellate counsel testified that although it was his opinion that Dr. Garrison "needed to talk to a jury," he was not called as a witness. Counsel also recalled that "agents of the State" were aware of the Petitioner's "serious delusions" involving seeing "demons" before the trial; counsel noted that this issue should have been raised before trial.

Relative to the beer bottle fragments, appellate counsel testified that before he filed the motion for a new trial, he was aware that the bottle was not collected as evidence. Nevertheless, counsel did not raise an issue in the motion for a new trial or on direct appeal regarding the bottle.

Appellate counsel did not recall discussing with the Petitioner his decision not to testify, although counsel acknowledged that he "spent a lot of time talking to" the Petitioner and that such a conversation may have occurred. Appellate counsel disagreed that the Petitioner would have been better served by trial counsel's continuing to represent him through the sentencing and motion for a new trial proceedings.

Appellate counsel testified that he did not file a Rule 11 appeal in the Petitioner's case and that he did not recall obtaining a waiver from the Petitioner. He similarly did not remember whether he filed a motion in this court to withdraw as counsel. When asked whether he sent the Petitioner a letter explaining the Rule 11 appeal process, counsel did not recall sending any letters to the Petitioner or speaking to the Petitioner on the telephone after the Petitioner was transferred to prison. Counsel noted that he communicated with the Petitioner's family members "daily." Counsel stated that if he was required to file a Rule 11 appeal "and ... didn't do it, then, yeah, it's definitely an error."

On cross-examination, appellate counsel testified that as of the date of the post-conviction hearing, he had handled seven or eight criminal trials; none of the trials resulted in acquittal for his clients or involved diminished capacity, self-defense, or a murder charge. Counsel did not recall ever speaking with Dr. Garrison. Counsel acknowledged that he had never tried a case in which he argued both self-defense and diminished capacity; he noted, however, that this fact "in no way change[ed] ... what should have been done."

Relative to Ms. Belew's not having testified at the sentencing hearing, appellate counsel testified that he "tried desperately" to call Ms. Belew at every hearing and that he "spent days of everyone in our office searching all over Marshall County looking for [Ms.] Belew." Appellate counsel stated that although he spoke with Ms. Belew at "great length" prior to the sentencing hearing and considered her "the linchpin of this case," he was unable to subpoena her to court. Appellate counsel noted that Ms. Belew was "apparently homeless at the time." Appellate counsel did not recall when he informed the Petitioner that Ms. Belew could not be located.

Appellate counsel denied doing anything improper at the Petitioner's sentencing hearing that would have affected the outcome of the case. Appellate counsel stated that he had about one hundred clients who had been treated at Centerstone and that Dr. Garrison had not mentioned diminished capacity in any of those reports except for the one in which he assessed the Petitioner. Appellate counsel stated that it would surprise him to learn that Dr. Garrison often mentioned diminished capacity in his reports.

A copy of Dr. Garrison's letter to the trial court was received as an exhibit and reflected that the Petitioner was competent to stand trial and that he was not experiencing a severe mental disease or defect that caused him to be unable to appreciate the wrongfulness of his actions. However, Dr. Garrison noted, "The [Petitioner] does appear to have a basis for a claim of diminished capacity." Appellate counsel did not recall whether he asked Dr. Garrison if he could "support diminished capacity."

Appellate counsel testified that the Petitioner filed a complaint against him and that counsel sent his entire file to the regulatory body, possibly after the "time frame had run out on the appeal[.]" Appellate counsel stated that he did not customarily save form letters to clients on his electronic system because the letters "[took] up too much data space."

At this juncture, the State moved to continue the proceedings relative to appellate counsel's testimony in order to subpoena the Petitioner's file from "Lincoln County" and allow appellate counsel to search his computer system for records of his communication with the Petitioner. The State noted that it was not informed of the Rule 11 issue until the day of the hearing. With the Petitioner's agreement, the post-conviction court granted the State's motion.

Continuing with further testimony, trial counsel testified that he had been an Assistant Public Defender for "several years" and had performed numerous jury trials. He stated that after he was appointed to represent the Petitioner in General Sessions Court, the Petitioner mentioned seeing shadow demons; as a result, counsel requested a mental evaluation. Counsel said that he received Dr. Garrison's letter and that he discussed the letter with the Petitioner and mailed him a copy. Although counsel initially stated that his office sent "copies of everything" to the Petitioner, counsel later stated that as a result of an "oversight," Dr. Garrison's letter was not mailed to the Petitioner. Counsel maintained, however, that he specifically discussed the letter with the Petitioner. Counsel recalled that during this conversation, counsel told the Petitioner that "insanity was not supported" and that he was competent to stand trial. Counsel also explained "the diminished capacity issue," which he agreed was a difficult concept for clients to understand. Counsel also agreed that diminished capacity was difficult to prove to a jury.

Trial counsel said that either he or another member of the defense team spoke to Dr. Garrison, although they did not visit him in person. Trial counsel did not think that the defense team requested the Petitioner's Centerstone records or contacted his mental health practitioners, and he noted that "from the beginning" they focused on self-defense.

Trial counsel testified that the Petitioner filed a "board complaint" against his office regarding "his discovery and his file." In response, counsel sent the Petitioner and the board "copies of letters of everything that we had stating ... what we had sent in." Counsel did not recall whether Dr. Garrison's letter was included in those materials.

Trial counsel agreed that he did not argue diminished capacity in the Petitioner's case. Counsel agreed that in some cases, a person with diminished capacity could be in unreasonable fear for his life. When asked whether counsel could "weave" diminished capacity into a self-defense argument to explain the Petitioner's behavior before and after the shooting and his statement about "Mexicans," counsel said that the Petitioner's police statements made no mention of shadow demons or feeling anxious. Counsel recounted the Petitioner's statement indicating that he acted in self-defense when three individuals threatened him and tried to hit him with a bottle. Counsel did not recall the Petitioner's making strange statements to the police about an impending war and Social Security's "fixing to go bankrupt."

Trial counsel testified that they "of course" considered having the Petitioner testify at his trial. Counsel averred that the Petitioner was incorrect when he stated that counsel never prepared him to testify. Counsel said that every time the defense team visited the Petitioner in jail, they questioned him about his version of events and "were going through essentially direct examination" and that they also asked the Petitioner "harder questions" to prepare him for cross-examination. Counsel stated that although the Petitioner had no previous criminal record, he would not have been a good witness because he had "inconsistencies in his story. When [trial counsel] would ask him about his inconsistencies, he would shift his story ... and then create another inconsistency or even ... change what he stated all together." Counsel elaborated,

For example, one of the things was the bottle and the gun, and [at] one point, [the Petitioner] would state that, I'm a terrible shot, so I could not have possibly been intending to kill these people, because I'm such a bad shot, it was an accident that I hit them in the first place. But, then the next sentence would be, but I shot the bottle out of his hand. So, all of a sudden he becomes a trick-shot artist.

But, then when you point that out, ... the story will become, well, when he swung the bottle, he hit the gun and knocked it down and that's what caused the bullet to hit him. On cross[-]examination, we had real concerns that his story would fall apart in the eyes of the jury.

Counsel stated that the Petitioner's police statements "covered the set up" of a self-defense argument and that at trial, they argued that the Petitioner's identification of Mr. Perryman, Mr. Beavers, and Mr. Keel as "Mexicans" was explained by the Petitioner's unfamiliarity with the men and their general skin tones. Counsel noted that the Petitioner's statement "was not some paranoid delusion. It[ was] a mistake of who they were." Counsel denied that the defense team threatened the Petitioner or forced him not to testify. Counsel stated that after the State closed its proof, they discussed with the Petitioner the evidence presented, the Petitioner's police statements, the arguments the defense could make based upon the statement, and counsel's concerns about the Petitioner's testifying.

Trial counsel testified that he did not recall Mr. Beavers's having been charged in an unrelated criminal case; counsel noted that "[w]e didn't represent [him] on that

case." Counsel affirmed that "from the beginning," the Petitioner discussed the beer bottle fragments and his wish that the fragments had been collected. Counsel stated that he filed no motion relevant to the bottle because in his opinion, any such motion would have been frivolous. Counsel noted that when the police arrived, the bottle had already been swept up and discarded and that the police photographed the fragments in a garbage can. Counsel stated that the police "made a point" to document the bottle and that the defense was able to argue that the bottle's presence was consistent with the Petitioner's version of events.

Upon examination by the post-conviction court, trial counsel testified that the Petitioner's police statements included discussion of the bottle and that the witnesses' testimony indicated that Mr. Perryman did not strike the Petitioner with a bottle. To counsel's recollection, Ms. Belew testified that Mr. Perryman had a bottle in his hand, although counsel did not recall whether Ms. Belew conveyed how or when the bottle fell to the floor.

On cross-examination, trial counsel testified that the Petitioner was arrested within one hour of the shooting and that in his police statement, the Petitioner only mentioned shooting the bottle, not touching the bottle with his pistol. Counsel affirmed that the Petitioner conveyed to the police his belief that he did not shoot anyone in the apartment. Counsel stated that at the time of the Petitioner's trial, he had tried more than thirty cases, "multiple" of which resulted in acquittals. Counsel agreed that he discussed the defense strategy with his co-counsel, including self-defense and diminished capacity. Counsel said that they also discussed diminished capacity with the Petitioner and its potential usefulness in obtaining a conviction for a lesser-included offense, but that the Petitioner "was not interested in that" and was "dead set" on arguing self-defense. Counsel noted that although the Petitioner's police interview contained "some odd statements," the Petitioner set out "a straight self-defense" account of events. Counsel stated that at trial, Mr. Beavers admitted on cross-examination that Mr. Perryman had threatened to "kick [the Petitioner's] a--."

Trial counsel testified that the defense team explored a potential diminished capacity argument by telephoning Dr. Garrison. Counsel stated that after speaking to Dr. Garrison, he did not feel that Dr. Garrison would have helped the Petitioner's case. Counsel said that the Petitioner had "agoraphobia and panic attacks," for which he took medication, and that the Petitioner mentioned having a beer in Ms. Belew's apartment, which counsel did not find to "provide a very strong argument" for diminished capacity. Counsel opined that the Petitioner's police statements provided the strongest self-defense argument. Counsel agreed that in Tennessee, diminished capacity was not, standing alone, a defense to guilt. He said that the Petitioner appeared to understand the concept of diminished capacity after they discussed it. Counsel stated that the Petitioner had always agreed with the self-defense theory.

Trial counsel averred that relative to the Petitioner's testifying, counsel was concerned that in light of the fact that the Petitioner did not experience mental

18

health symptoms during the shooting, his bringing up his mental health issues would confuse the jury. Counsel noted that if the Petitioner had discussed shadow demons or his mental health issues during his testimony, counsel would have called Dr. Garrison as a defense witness. Counsel stated that he believed a self-defense argument was stronger and easier for the jury to understand.

Trial counsel testified that in his opinion, the defense team handled the Petitioner's case as best it could given the circumstances. Counsel did not believe that forensic analysis of the broken beer bottle would have changed the outcome of the trial, and he noted the Petitioner's hearing testimony that the bottle might have broken when it hit the pistol rather than having been shot. Counsel stated that the defense argued generally that the presence of the broken bottle at the crime scene supported the Petitioner's version of events.

Trial counsel testified that relative to Ms. Belew's testimony, the Petitioner was "very hung up on" whether he spoke to Ms. Belew before arriving at her apartment. Counsel stated that co-counsel cross-examined Ms. Belew and that although counsel did not recall if co-counsel questioned Ms. Belew on this point, counsel felt that co-counsel's cross-examination was "very effective" and "put some big holes into her story." Counsel noted his belief that as a result of co-counsel's cross-examination, the jury acquitted the Petitioner of aggravated assault relative to Ms. Belew.

Trial counsel testified that relative to T-Roy's proposed testimony, the location in which the Petitioner parked his car was of no consequence to his case. Counsel noted that the Petitioner wanted to impeach Ms. Belew's statement that he parked in front of her apartment. Counsel agreed that the Petitioner's police statements indicated that he parked in front of a tire shop and that part of the State's premeditation argument was that the Petitioner walked back to his truck to retrieve the gun.

Relative to the motion to withdraw filed prior to the Petitioner's trial, trial counsel testified that another attorney in his office represented Mr. Beavers in a Bedford County case; after the case was closed, the attorney realized that Mr. Beavers was also a witness in the Petitioner's case. Trial counsel did not discuss the Petitioner's case with the attorney, and he did not believe that the attorney discussed it with co-counsel or the District Public Defender. Counsel stated that they filed a motion to withdraw based upon the appearance of impropriety; he noted, however, that the conflict "ran more towards Mr. Beavers rather than [the Petitioner], because [they] were in a position ... where [they were] going to have to cross[-]examine [Mr.] Beavers and there could be an appearance [they] would be potentially using inside information against him." Counsel said that he explained the conflict in these terms to the Petitioner multiple times and that the trial court found that no conflict existed and denied the motion to withdraw. Counsel did not recall the Petitioner's expressing any concern about the conflict, although counsel acknowledged that it was a confusing issue.

Trial counsel testified that generally, during a jail visit at a date close to trial, he would have explained to the Petitioner the right to testify, the State's evidence, the expected witnesses' testimony based upon defense interviews with the State's witnesses, and the Petitioner's police statements. Counsel stated that they interviewed every witness apart from Ms. Jacobson. Counsel stated that the Petitioner appeared to understand the discussions about what would happen if he testified and in which counsel "test[ed] his ability" to be a witness. Counsel noted that he always advised clients to decide whether to testify after the close of the State's proof so that counsel could give the client a better-informed opinion about the desirability of testifying. Counsel said that at the close of the State's evidence, he advised the Petitioner that the defense team was able to "poke several sizeable holes" in the witnesses' testimony, which gave them room to argue self-defense, along with the police statements and the photograph of the broken bottle. Counsel also advised the Petitioner of his concern that inconsistencies would arise during direct or cross examination, that it was in the Petitioner's best interest not to testify, and that the decision was ultimately the Petitioner's. Counsel affirmed that the Petitioner understood the conversation. Counsel denied that he ever told the Petitioner that the prosecutor would "holler at" him; counsel stated that he told the Petitioner that the prosecutor would "try to get him angry" or confuse him.

Upon examination by the post-conviction court, trial counsel affirmed that the defense team's telephone call to Dr. Garrison occurred in advance of trial and that counsel could have subpoenaed Dr. Garrison as a trial witness if his testimony would have been favorable to the Petitioner's case. Counsel stated that the fact that the Petitioner was taking anxiety medication made it difficult to argue to the jury that he was "having some kind of mental attack" during the shooting.

### b. Second evidentiary hearing

At the second evidentiary hearing on March 13, 2015, post-conviction counsel stated that consistent with the post-conviction court's instructions, she brought the Petitioner's complete file to the hearing. She averred that this file only reflected one letter from appellate counsel to the Petitioner.

In the context of explaining why two representation agreements existed in the Petitioner's case, appellate counsel testified that because the Petitioner had "a very strong diminished capacity situation," which had been described to counsel by "everyone" as the Petitioner's having "the approximate mentality of like a [twelve] or [thirteen]-year-old," counsel had the Petitioner's stepmother sign an agreement in his office in addition to the one the Petitioner signed in jail. Counsel stated that the Petitioner repeatedly asked counsel to explain concepts to his stepmother when the Petitioner did not understand them and that "whenever [counsel] explained things, they didn't stay explained."

The post-conviction court stated that it would issue a written order and that it had reached "a mixed conclusion." The court found no deficiencies in trial counsel's representation. However, the court found that appellate counsel's performance was

deficient, and the court granted the Petitioner a late-filed Rule 11 application for permission to appeal to our supreme court.

* * *

### e. Motion to Produce Evidence

On January 30, 2019, the Petitioner filed a pro se motion to produce evidence. According to a March 19, 2019 order denying the motion, the Petitioner sought to "produce a timely filed" Rule 11 application or a petition for post-conviction relief. Judge Burk, acting as the post-conviction court, reviewed the motion and found that the Petitioner's avenues for Rule 11 and post-conviction relief had been "exhausted." The court incorrectly noted that the August 24, 2017 order granting partial post-conviction relief "dismissed" the Petitioner's remaining post-conviction issues, and the court concluded that "due to the fact that all relief prayed for in the [Petitioner's] previously filed Petition for Post-Conviction Relief has been satisfied ... and/or dismissed this matter is hereby CONCLUDED."

The Petitioner subsequently filed a pro se notice of appeal on April 17, 2019; this court observed in a May 6, 2019 order dismissing the appeal that it was unclear from the post-conviction court's order whether it complied with Tennessee Supreme Court Rule 28, section 9(D), which provides that after unsuccessfully pursuing a delayed appeal, a petitioner should be permitted to amend his post-conviction petition to include any new issues arising during the appeal and that the post-conviction court should lift the previously-imposed stay in order to hear "any remaining grounds" raised in the post-conviction petition. Although the Petitioner did not have a right to appeal the post-conviction court's denial of his motion to produce evidence, this court noted that the Petitioner could appeal from any final post-conviction order if the post-conviction proceeding remained active.

On August 26, 2019, in accordance with this court's order, the post-conviction court acknowledged in a written order that the previous post-conviction court had stayed consideration of the remaining issues raised in the post-conviction petition. The court ordered that the first post-conviction hearing be transcribed to facilitate review of the remaining post-conviction issues, relieved second post-conviction counsel, appointed third post-conviction counsel, and set a hearing date at which the Petitioner could raise any additional issues.

### f. Third evidentiary hearing

At a November 8, 2019 hearing, the post-conviction court commented that the previous court's memorandum opinion adequately addressed the post-conviction issues and that the current court would draft a new order dismissing the post-conviction petition in order to facilitate appellate review. The court found relative to the Rule 11 issue that the Petitioner received a late-filed appeal and that he consequently was not prejudiced by appellate counsel's deficiency. The court noted relative to the remaining issues that it would adopt the previous court's findings.

21

When asked whether the Petitioner had additional issues to raise, third post-conviction counsel indicated that the Petitioner was unhappy with the amount of time it took the first post-conviction court to issue its memorandum opinion and for first post-conviction counsel to provide the Petitioner with his file. The State responded that the Petitioner received his Rule 11 appeal notwithstanding any delay.

(Doc. No. 11-15 at 7−26).

### III.    GOVERNING STANDARDS

A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The AEDPA creates both procedural and substantive limits on the Court's authority to grant habeas corpus relief for a petitioner in custody pursuant to a state court judgment. The Court sets forth the standards applicable to this Petition below.

### A.  Procedural Default

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court . . ., thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted). In Tennessee, a petitioner is "'deemed to have exhausted all available state remedies for [a] claim'" when the claim is presented to the Tennessee Court of Criminal Appeals. *Adams v. Holland*, 330 F.3d 398, 401 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). If a petitioner fails to properly exhaust a claim in state court, and the claim can no longer be raised in state proceedings because of a failure to follow state procedure for presenting such a

claim, the claim is "technically exhausted" but procedurally defaulted. *Woodford v. Ngo*, 548 U. S. 81, 126 (2006).

A petitioner may obtain merits review of a procedurally defaulted claim by demonstrating "cause and prejudice" for the default. *Sutton v. Carpenter*, 745 F.3d 787, 791 (6th Cir. 2014). To establish cause, the petitioner must show that "some objective factor external to his defense impeded his ability to comply with the state's procedural rule." *Bies v. Sheldon*, 775 F.3d 386, 396 (6th Cir. 2014). In Tennessee and many other states, a petitioner who raises a procedurally defaulted claim alleging ineffective assistance of trial counsel may demonstrate cause by showing that postconviction counsel was ineffective for failing to raise the claim in initial state postconviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 17 (2012) ("Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (extending *Martinez* to states with procedural frameworks that make unlikely a meaningful opportunity to raise ineffective assistance claim on direct appeal); *Sutton*, 745 F.3d at 795−96 (holding that *Martinez* and *Trevino* apply in Tennessee).

### B. Merits Review

Under the AEDPA, a federal court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court only if that adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

If a claim was not adjudicated on the merits in state court, this Court applies the "pre-AEDPA standard of review: *de novo* for questions of law (including mixed questions of law and fact), and clear error for questions of fact." *Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011); *see* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

## IV.    ANALYSIS

Petitioner raises multiple grounds of ineffective assistance of trial counsel and ineffective assistance of appellate counsel. Respondent argues that one aspect of Petitioner's ineffective-assistance-of-appellate-counsel claim is procedurally defaulted and that the remainder of Petitioner's claims do not warrant relief under 28 U.S.C. § 2245(d). The Court will first address the procedural default argument before turning to the merits of Petitioner's claims.

### A. Procedural Default

Respondent argues that Petitioner procedurally defaulted any claim that appellate counsel was ineffective for failing to compile and file an adequate record on appeal, because Petitioner did not present this claim in state court and there is no vehicle available for him to do so now. (Doc. No. 20 at 55). Petitioner concedes that he did not present the claim in state court. (Doc. No. 1 at 22) ("'*Failed to prepare and file an adequate record on appeal*' was not previously presented in any other court, State or Federal."). It is therefore procedurally defaulted. *Woodford v. Ngo*, 548 U.S. 81, 126 (2006) (such a claim is "technically exhausted" but procedurally defaulted).

24

Petitioner seeks to rely on postconviction counsel's alleged ineffectiveness to excuse the default. (Doc. No. 1 at 22) ("Post-Conviction counsel procedurally defaulted this obvious issue at the initial-review collateral proceedings."). But the *Martinez* exception—which allows a petitioner to assert postconviction counsel's ineffectiveness as cause to excuse a default—does not apply when the underlying defaulted claim asserts ineffective assistance of appellate counsel. *Davila v. Davis*, 582 U.S. 521, 529 (2017) (declining "to extend *Martinez* to allow a federal court to hear a substantial, but procedurally defaulted, claim of ineffective assistance of appellate counsel when a prisoner's state postconviction counsel provides ineffective assistance by failing to raise that claim").

Petitioner cannot rely on postconviction counsel's alleged ineffectiveness to excuse the defaulted claim of ineffective assistance of appellate counsel, and Petitioner asserts no other basis to excuse the default. Therefore, this claim will be denied as procedurally defaulted.

**B. Merits Review**

The Court will address the merits of Petitioner's remaining grounds of ineffective assistance of counsel in turn.

1. <u>Motion to Dismiss Based on Failure to Preserve Evidence</u>

Petitioner argues that trial counsel was ineffective for failing to file a motion to dismiss his prosecution as a sanction because the State failed to preserve the broken beer bottle found in the garbage at the scene of the shootings. (Doc. No. 1 at 5−8). The Tennessee Court of Criminal Appeals found that trial counsel's performance was neither deficient nor prejudicial: (Doc. No. 11-15 at 30).

Petitioner argues, as he argued on postconviction appeal, that there is a reasonable probability a motion to dismiss the prosecution for failure to preserve evidence would have been

successful under Tennessee law. (*See* Doc. No. 1 at 6−8) (arguing that trial counsel should have filed a motion pursuant to *State v. Ferguson*, 2 S.W. 3d 912 (Tenn. 1999)). The Tennessee Court of Criminal Appeals rejected this argument, finding that such a motion would have failed. (Doc. No. 11-15 at 30).

It is not this Court's role in federal habeas proceedings to disturb a Tennessee state court's application of Tennessee law. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). And in light of the Tennessee Court of Criminal Appeals' determination that any motion to dismiss would have failed as a matter of state law, Petitioner cannot demonstrate that the state court unreasonably concluded that Petitioner failed to demonstrate deficient performance or prejudice.[2] *See Gillepsie v. Ohio State Penitentiary*, No. 16-3991, 2017 WL 3951851, at *2 (6th Cir. Apr. 5, 2017) (holding petitioner could not demonstrate prejudice for failing to make a state-law argument that state court of appeals had rejected). He is therefore not entitled to habeas corpus relief.

### 2. Petitioner's Decision Not to Testify

Petitioner alleges that trial counsel "coerced" him into not testifying. (Doc. No. 1 at 8−11). The Tennessee Court of Criminal Appeals found, as a factual matter, that "the record does not reflect[] that counsel pressured or coerced the Petitioner in any way." (Doc. No. 11-15 at 31−32). Based on this finding, the Tennessee Court of Criminal Appeals held that Petitioner had not demonstrated deficient performance. (*Id.* at 32.)

---

[2] Petitioner rightly does not argue that a motion to dismiss based on federal constitutional law would have been successful. Under clearly established Supreme Court precedent, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Petitioner has not made a showing of bad faith, either in this Court or in the state courts.

26

Petitioner testified at a postconviction hearing about his decision not to testify at trial:

A:     I went back and talked to Mr. Collins and Harold for about half an hour back there.

Q:     When was that?

A:     That was the day that I was supposed to testify while during my trial. They told me back there that since I had nothing entered on my behalf that I was probably going to get yelled at and stuff by Mr. Barnard and that's what they had told me. And they said that tape and my written statement would be sufficient to prove the self-defense, but because I didn't have nothing else up there backing me, getting on the stand wasn't good. They recommended against me testifying.

Q:     And did you follow their recommendation?

A:     Yes.

Q:     Do you feel like they forced you not to testify.

A:     I understood what they were saying when I didn't have nothing to back me up of what I would say on the stand.

Q:     It was your word versus the word of everybody else that was there?

A:     Right.

Q:     Did you not think that maybe telling the same story the exact way two times might give you some credibility where maybe they cannot tell the exact same story the same two times?

A:     No.

Q:     Was there any discussion with you prior to your trial about you testifying at your trial?

A:     They just said if I wanted to testify, I could at my trial before that.

Q:     Anybody try to prep you to testify at trial? Anybody go through any preparations with you for testifying in a jury trial?

A:     No. I remember them coming to the jail and saying it's my word against the others.

Q:     Your word against everybody else's?

A:     Yeah.

Q:     So, the Court is going to want to know this, how is it that the PD's office coerced you into not testifying?

27

A: I took their advice and didn't testify, and I don't know the process that well like that.

Q: You just did everything they told you to do?

A: Yes, ma'am.

(Doc. No. 11-3 at 27−29).

Based on this testimony, the Tennessee Court of Criminal Appeals reasonably found that Petitioner was not coerced and instead made a voluntary decision not to testify based on counsel's advice. (Doc. No. 11-15 at 31−32). And because trial counsel did not coerce Petitioner into not testifying, his ineffective assistance of trial counsel claim based on this allegation was reasonably denied. (*Id.*)

### 3. Diminished-Capacity Theory of Defense

Petitioner alleges that trial counsel was ineffective for failing to pursue a diminished-capacity theory of defense. "Diminished capacity" is not a stand-alone defense under Tennessee law. *State v. Hall*, 958 S.W.2d 679, 689 (Tenn. 1997). Instead, it represents "an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense. . . . In other words, 'diminished capacity' is actually a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state." *Id.* at 688.

The Tennessee Court of Criminal Appeals found that trial counsel made a well-reasoned tactical decision not to pursue such a defense. (Doc. No. 11-15 at 33). The appellate court also found no prejudice because Petitioner failed to show that such a defense would have been viable. (Doc. No. 11-15 at 32−33) ("[W]e agree with the post-conviction court's finding that the Petitioner has not presented any evidence to indicate that he would have successfully argued diminished capacity at trial."). Both conclusions were reasonable.

Petitioner asserts that testimony from Dr. Garrison would have supported a diminished-capacity theory of defense. (Doc. No. 1 at 11−15). But Dr. Garrison clarified at Petitioner's sentencing hearing, "I am not concluding he has diminished capacity." (Doc. No. 10-6 at 7). Indeed, Petitioner has not presented or identified any evidence to indicate that he was incapable of forming the requisite mental state to be convicted of first-degree murder or attempted first-degree murder.

Petitioner was diagnosed with depression, anxiety, and agoraphobia. (Doc. No. 11-11 at 10). But Petitioner has not shown how these disorders prevented him from forming the requisite mental state. And, as trial counsel recognized, in Petitioner's written and oral statements to police immediately after the shootings, he did not mention having experienced any symptoms of panic, anxiety, or depression at the time of the shootings. (Doc. No. 11-3 at 131).

Trial counsel's decision to forego a diminished capacity theory of defense was reasonable, and the Tennessee Court of Criminal Appeals therefore reasonably found that trial counsel's performance was not deficient. Additionally, failed to show any reasonable probability that such a defense would have been successful, so the Tennessee Court of Criminal Appeals also reasonably found lack of prejudice. Petitioner is not entitled to relief on this claim.

### 4. Telephone Records and Uncalled Witnesses

Petitioner alleges that trial counsel was ineffective for failing to subpoena Petitioner's telephone records and for failing to investigate and call Shawn Julian and an expert on the effects of Xanax. (Doc. No. 1 at 15−19). The Tennessee Court of Criminal Appeals found that Petitioner had failed to demonstrate ineffective assistance of counsel because he did not present the telephone records, Mr. Julian's testimony, or the testimony of an expert regarding the effects of Xanax. (Doc. No. 11-15 at 34) ("This court may not speculate on the content of the records or the proposed

29

testimony."). This holding was reasonable. Indeed, the Sixth Circuit has similarly held that a petitioner alleging ineffective assistance of counsel for failure to call a witness must cannot demonstrate prejudice without admissible evidence of how the witness would have testified. *Clark v. Waller*, 490 F.3d 551, 557 (6th Cir. 2007) (finding no prejudice where petitioner "offered no evidence, beyond his assertions, to prove what the content of [the proposed witness's] testimony would have been"). Accordingly, Petitioner is not entitled to relief on these claims.

5. Conflict of Interest

Petitioner alleges that trial counsel operated under a conflict of interest because other attorneys in the same public defender's office had represented one of the victims, Mr. Beavers, in an unrelated matter. (Doc. No. 1 at 19−20). The Tennessee Court of Criminal Appeals denied relief on this claim, finding that Petitioner had not demonstrated that any alleged conflict of interest influenced trial counsel's performance. (Doc. No. 11-15 at 34−35). This conclusion was reasonable.

At most, Petitioner alleges a potential conflict of interest based on "successive representation," because he has not demonstrated that trial counsel (or any other attorney at the public defender's office) represented Mr. Beavers at the time of trial. *See Moss v. United States*, 323 F.3d 445, 459 (6th Cir. 2003) ("Successive representation occurs where defense counsel has previously represented a co-defendant or trial witness."). In such cases, a Petitioner must demonstrate prejudice resulting from the alleged conflict. *Lordi v. Ishee*, 384 F.3d 189, 193 (6th Cir. 2004).

Petitioner does not identify any prejudice resulting from the alleged conflict. (Doc. No. 1 at 19−20). He has therefore failed to show that the Tennessee Court of Criminal Appeals relied on

an unreasonable determination of fact or unreasonable application of clearly established law, and he cannot obtain relief on this claim. *See* 28 U.S.C. § 2254(d).

6. <u>Ms. Belew</u>

Finally, Petitioner alleges that appellate counsel was ineffective for failing to subpoena Ms. Belew to testify at sentencing. (Doc. No. 1 at 20−22). The Tennessee Court of Criminal Appeals denied relief, finding that Petitioner had failed to introduce admissible evidence regarding how Ms. Belew would have testified at sentencing. (Doc. No. 11-15 at 36). Petitioner asserts that Ms. Belew had told prosecutors that Petitioner had mentioned seeing "shadow demons." (Doc. No. 1 at 20). But the Tennessee Court of Criminal Appeals found that Petitioner had failed to introduce admissible evidence regarding how Ms. Belew would have testified.[3] (Doc. No. 11-15 at 33, 36). This finding was reasonable, and Petitioner has therefore failed to demonstrate prejudice from the failure to subpoena Ms. Belew at sentencing. *See Clark*, 490 F.3d at 557.

## V. CERTIFICATE OF APPEALABILITY

Because Petitioner has failed to demonstrate that he is entitled to relief under 28 U.S.C. § 2254(d) as to any of his claims, the Petition will be denied.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas corpus petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's

---

[3] At a post-trial hearing, Petitioner sought to introduce testimony from a defense investigator that Ms. Belew had told the investigator that she mentioned in a statement to police that Petitioner had reported seeing shadow demons. (*See* Doc. No. 11-15 at 6). This testimony was excluded as inadmissible hearsay. (*Id.*)

resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El V. Cockrell*, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Here, because jurists of reason would not disagree with the resolution of Petitioner's claims, the Court will deny a certificate of appealability. However, Petitioner may seek a certificate of appealability from the Sixth Circuit.

## VI. CONCLUSION

For the reasons set forth above, Petitioner's 28 U.S.C. § 2254 petition for a writ of habeas corpus is **DENIED**, and this action is **DISMISSED** with prejudice. This Court **DENIES** a certificate of appealability.

Petitioner's Motion to Compel (Doc. No. 28) is **DENIED** as moot.

This Order resolves all claims in the action. The clerk **SHALL** enter final judgment in accordance with this Order.

It is so **ORDERED**.

WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE

32